IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CAROLYN H. SRIVASTAVA,                    )
                                          )
                    Plaintiff,            )
                                          )
        vs.                               )   Cause no.
                                          )
THOMAS CARROLL, PATRICK McCARTY,          )
BERNARD PYLITT, JOHN HAMMEL, AND          )
CALE BRADFORD, all Individually and as    )   1:04-cv-0810-DFH-WTL
Judges of the Marion County Superior Court,)
JOE KERNAN, JUSTICES OF THE INDIANA       )
SUPREME COURT, JUDGES OF THE              )
INDIANA COURT OF APPEALS, UNITED          )
STATES DISTRICT COURT FOR THE             )
SOUTHERN DISTRICT OF INDIANA,             )
UNITED STATES COURT OF APPEALS FOR        )
THE SEVENTH CIRCUIT, THE SUPREME          )
COURT OF THE UNITED STATES, UNION         )
FOR REFORM JUDAISM, HEBREW UNION          )
COLLEGE-JEWISH INSTITUTE OF RELIGION,     )
INDIANAPOLIS HEBREW CONGREGATION,         )
INC., JONATHAN ADLAND, DIRECTORS          )
OF CONGREGATION BETH-EL ZEDECK,           )
CONGREGATION BETH-EL ZEDECK,              )
BREBEUF JESUIT PREPARATORY SCHOOL,        )
WOODEN & McLAUGHLIN LLP., AND             )
DORIS ANNE SADLER Individually and        )
as Marion County Clerk,                   )
                                          )
                    Defendants.           )

## COMPLAINT AND JURY DEMAND

Plaintiff brings a complaint against defendant government entities and officials and their

collaborating private entities and individuals for violating plaintiff's constitutional rights includ-

ing free exercise of religion and property interest in membership in the religious congregation of

her choice, and for denying plaintiff due process in perpetuating unjustified law enforcement ac-

tions against plaintiff, in denying plaintiff a fair hearing of her claims in state and federal courts,

in denying plaintiff access to the filings on which judicial decisions were based, and for violations of the Fair Debt Collection Practices Act, principally during the period December, 2003 through April, 2004.

Pursuant to *Fed.R.Civ.P.* 38(b) and Local Rule L.R. 38.1 for the Southern District of Indiana, plaintiff demands a jury trial.

## I. PARTIES

### A. Plaintiff

1. Plaintiff Carolyn H. Srivastava, Ph.D. is a female citizen of Marion County, Indiana, which shares a common government with Indianapolis, Indiana. Plaintiff has been a resident and taxpayer of Marion County, Indiana continuously since 1985.

### B. Defendants

2. Defendant Thomas Carroll is Presiding Judge of Marion Superior Court Civil Division 6. He is being sued in his personal and official capacities.

3. Defendant Patrick McCarty is Presiding Judge of Marion Superior Court Civil Division 3. He is being sued in his personal and official capacities.

4. Defendant Bernard Pylitt is Presiding Judge of the Hamilton County, Indiana Superior Court Number 2. He has been appointed Special Judge of the Marion Superior Court by the Indiana Supreme Court to hear one of the cases to which plaintiff is a party. He is being sued in his personal and official capacities.

5. Defendant John Hammel is Presiding Judge of Marion Superior Court Criminal Division 21. He is being sued in his personal and official capacities.

6.  Defendant Cale Bradford Presiding Judge of the Marion Superior Court, Civil Division 1. Bradford is being sued in his personal capacity and his official capacity as Presiding Judge of the Marion Superior Court.

7.  Defendant Joe Kernan as Governor of the State of Indiana enforces the laws of Indiana.

8.  Defendants Justices of the Indiana Supreme Court are being sued in their individual and official capacities. The Honorable Randall T. Shepard is Chief Justice. The Indiana Supreme Court is vested by the *Constitution of the State of Indiana* with authority to supervise the exercise of jurisdiction of inferior Indiana state courts, and to supervise the practice of law within Indiana, including admission to the bar and discipline of attorneys and judges. The Indiana Supreme Court may also at its discretion review decisions of the Indiana Court of Appeals.

9.  Defendants Judges of the Indiana Court of Appeals are being sued in their personal and official capacities. The Honorable Patricia Riley is currently acting Chief Judge. The Indiana Court of Appeals is empowered to review civil and criminal judgments of circuit and superior courts of Indiana.

10.  Defendant United States District Court for the Southern District of Indiana (hereinafter, "District Court") and the judges thereof has original jurisdiction over federal civil and criminal matters arising in Marion County, Indiana and surrounding areas.

11.  Defendant United States Court of Appeals for the Seventh Circuit and the judges thereof (hereinafter, "Seventh Circuit") is empowered to exercise jurisdiction over appeals from judgments of the United States District Court for the Southern District of Indiana.

3

12.  Defendant Supreme Court of the United States and the justices thereof supervises the lower federal courts and exercises jurisdiction over selected appeals from federal courts of appeals and state supreme courts.

13.  Defendant Union for Reform Judaism ("URJ"), formerly known as the Union of American Hebrew Congregations (UAHC), is the umbrella organization for Reform Jewish congregations in North America, coordinating activities and performing services for its member congregations such as matching rabbis with congregations seeking to hire a new rabbi.

14.  Defendant Hebrew Union College-Jewish Institute of Religion ("HUC-JIR") is and has been during all relevant times the institution which selects candidates, trains, and ordains clergy (rabbis and cantors) of the Reform Jewish faith in North America.

15.  Defendant Indianapolis Hebrew Congregation, Inc. ("IHC") purports to be a Reform Jewish a religious congregation located in Marion County, Indiana. IHC has elected to incorporate as a not-for-profit corporation under Indiana law.

16.  Defendant Jonathan Adland ("Adland") has held the position of senior rabbi of IHC from approximately July 1, 2003 up to the date of filing this complaint.

17.  Defendants Directors of Congregation Beth-El Zedeck (hereinafter, "Beth-El Directors") manage the affairs of that congregation, including making decisions regarding membership. The individuals comprising Beth-El Directors, according to the congregation's Internet website are David Kosene (president), Barrie Fisch, Mark Bernstein, Karl Smith, Steve Crell, Alice Berkowitz, Gerald Goldstone, Barbara Bohard, Stephen I. Calderon, Barbara Cohn, Michelle Connell, Joel Epstein, Jeff Eschowsky, Andrew Fogle, Ellen Gabovitch, Jamie Gray, Joel Grynheim, Spencer Kline, Robert Koor, Cindy Koplow, Sharon Mishkin, Larry Mitzman, Brian Nachlis, David Orentlicher, Steven Rosenberg, Joan Rubenstein, Gary Sachs, Jane Safrin, Morris

4

Silverman, Deborah Simon, Mary Smith, David Vonnegut-Gabovitch, Eva Weisz, Cindy Wides, Jennifer Williams, and Jackie Wolf.

18. Defendant Congregation Beth-El Zedeck is a Conservative-Reconstructionist Jewish association located in Marion County, Indiana.

19. Defendant Brebeuf Jesuit Preparatory School ("Brebeuf") is a private secondary school located in Marion County, Indiana, managed by the Jesuits, an order within the Catholic faith, and attended by plaintiff's son.

20. Defendant Wooden & McLaughlin LLP is a law firm whose principal place of business is Marion County, Indiana, and which has represented defendants associated with Indiana University in various lawsuits to which plaintiff has been a party.

21. Defendant Doris Anne Sadler ("Sadler") has held the office of Marion County Clerk from January 1, 2003 through the date of filing this complaint. As such, she is the Clerk of the Marion County Circuit and Superior Courts. As Clerk, Sadler is responsible for keeping the records of the Marion County Superior Court and for administering elections in Marion County, Indiana. Her functions are ministerial, not discretionary. The term of office of the county clerk is four years. Sadler is being sued in both her personal capacity and official capacity (i.e. Marion County Clerk's Office).

22. Judicial defendants are not entitled to absolute immunity because they acted in excess of jurisdiction and/or in the absence of all jurisdiction, and have exhibited a reckless disregard for plaintiff's rights.

23. State actors are not entitled to Eleventh Amendment immunity because plaintiff is requesting only injunctive relief, not monetary damages, from them in their official capacities.

Natural persons, including state actors sued in their individual or personal capacities, are not entitled to Eleventh Amendment immunity at all.

24.  Marion County Superior Court, a court of original jurisdiction empowered to resolve civil and criminal matters arising within Marion County, Indiana, and Marion County Clerk's Office are local government entities funded mainly by county revenue. As such, they are entitled to neither individual immunities nor Eleventh Amendment immunity and may be sued for monetary damages and injunctive relief.

## II. JURISDICTION

25.  This complaint is brought pursuant to the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983, the First, Fifth, and Sixth Amendments to the *Constitution of the United States* pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), common law right of access to filings upon which judicial decisions are based, and the Fair Debt Collection Practices Act, 15 U.S.C. § 1692.

26.  Jurisdiction of federal district court is invoked pursuant to 28 U.S.C. §§ 1331, 1343 (a)(3), 1346 (a), 1361, 2201, and 2202, and 15 U.S.C. § 1692k (d).

27.  Venue is proper in the Southern District of Indiana, Indianapolis Division, pursuant to 28 U.S.C. §§ 94 (b)(1), 1391 (b), and 1402 (a)(2).

## III. FACTUAL ALLEGATIONS

### A. General allegations

28.  Many individuals and entities named as defendants in this action are judges or courts. Courts are the segment of our government empowered to order individuals and entities to act or to refrain from acting, and to compel compliance with such orders by deprivation of liberty,

property, and even life. Thus, when judges use their positions to disregard the law, the resulting damage is particularly severe.

29.   State and federal Indiana courts have established a policy whereby attorneys are permitted to freely violate laws and court rules without even a reprimand, while *pro se* non-attorney litigants are severely punished, by summary dismissal of their complaints for frivolous reasons if they are civil plaintiffs, and by fraudulently engineered convictions if they are criminal defendants, for the most minor of mistakes.

30.   In plaintiff's experience, the courts of Indiana exist to accommodate the whims of rich and powerful criminals, and to abuse the innocent and defenseless, by presuming to exercise jurisdiction over matters without legal authority to do so, and by refusing to exercise jurisdiction when they have a duty to do so.

31.   In Indiana, women have been treated as second-class citizens, and single women have been particularly targeted for abuse by all segments of society. Many women, especially those with wealthy husbands, instead of asserting their legal rights, actively participate in the abuse of other, more vulnerable women. A very qualified woman, State Senator Vi Simpson, tried to run for governor of Indiana in 2004. There was such strong opposition to her candidacy, solely because she is a woman, that she was forced to withdraw from the race.

32.   As recently admitted by Marion County government officials, plaintiff has, without her knowledge, been used as a scapegoat for one Ora Pescovitz ("Pescovitz"), a glib, sex-obsessed, psychopathic killer, who is concerned only with enhancing her own power and glory. To obtain benefits to which she is not entitled, Pescovitz has aggressively manipulated gullible men with sex. She likely employs illegal mind-altering drugs as well. Pescovitz has been likened to Adolf Hitler. As justification for their scapegoating, Marion County government officials have

7

established a "religious doctrine" that Pescovitz is entitled to a scapegoat because she is the daughter of a rabbi.

33. Pescovitz has succeeded in provoking susceptible men and their female collaborators into engaging in corrupt and abusive practices, such that they have formed a stable criminal racketeering enterprise composed of numerous individuals and associations, the purpose of which is to control the lives of the citizens of Marion County, Indiana, to subjugate women, and to use government and other positions of power to extort money from citizens, including plaintiff. Plaintiff refers to the enterprise hereinafter as the "Syndicate."

34. Individual members of the enterprise include Indiana University ("IU") faculty and administrators Ora Pescovitz, Gerald Bepko ("Bepko"), Richard Schreiner ("Schreiner"), Hal Broxmeyer ("Broxmeyer"), and Norman Lefstein, Marion Superior Court judicial officers Louis Rosenberg ("Rosenberg"), Gerald Zore ("Zore"), Cynthia Ayers, Clark Rogers, and Danielle Gaughan, former Marion County sheriff Jack Cottey, former Marion County prosecutor Scott Newman ("Newman"), current Marion County prosecutor Carl Brizzi ("Brizzi"), deputy prosecutor Linda Major, former Marion County clerk Sarah Taylor ("Taylor"), Sadler, IHC members including Charlene Pfenninger, Carolyn Hiser, Gary Vigran, Karen Stern, and Linda Falender, Prudential local branch manager Gerald Berg, private citizens Lula Patton, Alan Schwartz, Saroj Shah, Elizabeth Bassett, Janice Mitchell-Hankins, and Bob Danielson, Brebeuf Jesuit Preparatory School teacher Sarah Jackman, and private attorneys Richard Skiles and Paul Fulkerson.

35. A number of the syndicate members grew up in Chicago and later moved to Indiana. They have used this circumstance to confer on themselves status superior to that of Indiana natives. Plaintiff does not know the position in syndicate members' hierarchy of those who grew up on the East or West Coast, or in foreign countries.

8

36. Syndicate members have established and maintained a practice within IU and Marion County of requiring women to perform oral copulation on them as individuals in positions of power in order to obtain the basic employment benefits which IU was contractually obligated to provide, and in order to enjoy the basic liberties guaranteed by the *Constitution of the United States*. Such practice is often referred to as *quid pro quo* sexual harassment in employment discrimination law. Plaintiff has refused to comply.

37. Those individual syndicate members who have held taxpayer-funded positions in various legitimate governmental organizations, as alleged in this complaint, have used those positions as a front for their racketeering activity, which has included commission of numerous crimes against plaintiff's person and property, and that of plaintiff's son, including kidnapping, intimidation, battery, and criminal confinement. In order to accommodate Pescovitz's jealousy and to punish plaintiff for refusing to submit to their voracious appetites for sex, syndicate members have interfered in and disrupted every aspect of plaintiff's life.

38. Syndicate members have used money illegally obtained to fund their enterprise, including election campaigns to ensure the continued existence of the enterprise. Of course, racketeering activity by government officials results in egregious civil rights violations.

39. Syndicate members have preyed upon plaintiff because she is a single, unemployed woman without a husband to stand up for her (defendants employed Pescovitz to break up plaintiff's marriage several years ago, and have since used her to intimidate away any potential suitors to keep plaintiff in a vulnerable position), and because she Is Jewish. Thus, syndicate members have found plaintiff to be an easy target for their abuse.

40. The Marion County Prosecutor's Office under the leadership of Newman and Brizzi has engaged in a practice of scapegoating, prosecuting innocent citizens for crimes so that the

real offenders may go free to commit further crimes. Thus, Newman and Brizzi have committed the offense of assisting a criminal under Ind.Code § 35-41-2-4 which provides:

> "Sec. 4. A person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense, even if the other person:
>
> (1) has not been prosecuted for the offense;
> (2) has not been convicted of the offense; or
> (3) has been acquitted of the offense."

41. Additionally, Brizzi, in collaboration with Sadler, has launched a campaign of aggressive entrapment, pressuring vulnerable, innocent citizens into committing "crimes" which they had no intention of committing, thus adding to the caseload of an already overburdened court system.

42. Defendant judges and Marion Superior Court have done little to stop these abusive practices, instead allowing Newman and Brizzi to run the court as if they owned it. As part of this reckless indifference to the rights of Marion County citizens, defendant Marion Superior Court and its judges, particularly those of the criminal division, have perpetrated a pattern of egregious procedural violations resulting in denial of litigants' substantive rights. The practice has been to blame criminal defendants for judges' errors and omissions, and to punish the defendants by abolishing all of their constitutional rights. Of course, criminal defendants make easy targets.

43. As a result of abuses by syndicate members, plaintiff has been a party to a number of cases in state and federal courts over the past seven years. Plaintiff has proceeded *pro se* in all of them. Defendant judges and courts have heard the cases in question. A list of all cases to which plaintiff has been a party from 1997 up to the date of filing this complaint is attached hereto as Exhibit 1.

44. Plaintiff has not received fair treatment in any of the cases to which she has been a party, because of her *pro se* non-attorney status, and because she is a single woman. All of the federal cases have been dismissed, citing immunities created by defendant United States Supreme Court: Eleventh Amendment immunity, judicial immunity, prosecutorial immunity, lack of *respondeat superior* liability under 42 U.S.C. § 1983 (which was twisted into a rationalization that no one holding a supervisory position in government may be held liable for his/her actions), even though plaintiff's claims fell within the Court-defined exceptions to these "immunities."

45. Furthermore, 42 U.S.C. § 1983 and its companion statute 42 U.S.C. § 1988 as amended in 1996 by Public Law 104-317 specifically allow for recovery of injunctive relief, costs, and attorney's fees from judicial officers acting in their judicial capacities. If judicial officers may be held liable for their official actions, then so may prosecutors and clerks be held liable.

46. Syndicate members have used the aforementioned immunities to invent their own "immunity": immunity from suit for those who simply do not wish to be sued. Syndicate members' rationalizations in the litigation have been so bizarre that plaintiff concludes they are all on drugs and/or mentally ill.

47. Sadler and her predecessor Sarah Taylor have made what might be considered to be the most absurd claims, arguing that they have a "discretionary" right to falsify court records and forge court documents. Sadler also refuses to adhere to the case numbering system established by the Indiana Supreme Court and clearly set forth in the *Indiana Rules of Court – State*, inventing her own case-type designations, changing chronological case numbers, and altering filing date designations. The latter practice is of particular concern because of statutes of limitations for fil-

ing claims and changes in the law which might affect the disposition of a case. Sadler is creating havoc for litigants and attorneys trying to keep track of their cases.

48. The Marion County Clerk's Office has perpetrated election violations. In 2002, the Taylor, Newman, Rosenberg, and Lula Patton to forge documents, illegally placing an illegitimate candidate's name on the ballot to deny plaintiff her right as the only legitimate candidate to be precinct committeeman of her precinct. Taylor also altered the results of the secretary of state race in Marion County. In 2003, Sadler printed a campaign slogan for her party right on the ballot, a felony under Indiana law. The ballots had to be reprinted at taxpayer expense.

49. It is plaintiff's understanding that the Civil Rights Act of 1871 was passed during Reconstruction by Congress pursuant to the authority conferred by Section V of the Fourteenth Amendment to the *Constitution of the United States* to enable aggrieved citizens to vindicate their constitutional rights in federal court, because they may not be able to obtain justice in highly politicized state courts. However, defendant United States Supreme Court, in its decisions creating exemptions from liability under the statute for almost everyone, has rendered the statute effectively useless. Defendants United States Supreme Court and inferior federal courts have given government officials free reign to viciously and relentlessly commit crimes against innocent citizens without ever being held accountable for their actions. It is a case of a good old boys network, attorneys protecting their own without concern for the public whom they are paid to serve.

**B. Denial of due process through legal malpractice**

50. For each civil case listed in Exhibit 1, plaintiff paid the filing fee or the appellate docketing fee as appropriate and complied with the other requirements for commencing an ac-

tion/appeal, thereby acquiring a property interest in receiving a fair hearing of her claims in accordance with applicable law.

51.   In representing herself, plaintiff has spent many, many hours in researching and drafting pleadings, motions, etc. and in preparation for oral proceedings.

52.   Syndicate members have devised a scheme whereby they can employ deception to exert unauthorized control over plaintiff's money with intent to deprive her of its use and value, and deny her a fair hearing of her claims. Various women have impersonated plaintiff in courts, while Bepko, whose license to practice law has been inactive since 1991, has "represented" plaintiff without her knowledge or consent by preparing poor-quality documents containing forgeries of plaintiff's signature for the women to submit to courts on her behalf. Copies of plaintiff's signature are easily obtainable from the numerous filings which she submitted to various courts, and from the service copies and cover letters with which plaintiff has served opposing counsel.

53.   Bepko, through his female accomplices, while remaining in the background himself, has then asserted to courts that plaintiff's real filings, which contain her original signature, were written by someone else and forged by plaintiff (?) and that the poor-quality filings prepared by Bepko and submitted by the identity thieves were really those of plaintiff. The identity thieves have also apparently impersonated plaintiff in court hearings, offering fraudulent testimony in her name, and allowing opposing parties to gain *ex parte* access to the courts.

54.   Some of the female identity thieves have been Pescovitz, Charlene Pfenninger, Carolyn Hiser, and deputy prosecutor Linda Major.

55.   Numerous judicial opinions in numerous cases have apparently been issued based on Bepko-generated drivel, and on bizarre testimony of the identity thieves, not on plaintiff's real

filings containing solid legal arguments and plaintiff's real testimony. If the cases had been decided on plaintiff's real filings and testimony instead of the forgeries, she would have prevailed.

56.  Plaintiff has received some information that Newman has also engaged in the legal malpractice against plaintiff.

57.  Bepko, Newman, and Brizzi and their collaborators have used purported judges lacking jurisdiction, or alternatively have collaborated with Sadler to steal judges' signature stamps to award themselves "attorney's fees" for their unauthorized bad work purportedly performed on plaintiff's behalf.

58.  They have used as fraudulent justification bills of costs prepared by their own counsel, including Wooden & McLaughlin attorneys, for their counsel's real work in defending them. Thus, Wooden & McLaughlin attorneys have collaborated in the taking of plaintiff's money without due process of law (i.e. theft and robbery).

59.  Bepko was named as a defendant in some of the lawsuits in which he has purported to represent plaintiff, such that he was "representing" the opposing party in litigation to which he was a party. This would be a clear conflict of interest, even if Bepko was legitimately practicing law.

60.  Bepko has been assisted in his legal malpractice by defendant judges and courts. They have conducted *in camera* and other *ex parte* proceedings in which he allowed women to commit identity theft and identity deception against plaintiff. Judges know what syndicate members are doing, but they have allowed them to get away with their deception. Defendant Judge Carroll particularly has conducted numerous hearings over the past three years, hearings at which plaintiff was personally present and affirmatively testified as to her identity, so he certainly knows who she really is.

61. Sadler and her deputies have participated in the legal malpractice and identity deception by withholding plaintiff's filings from judges, by impeding plaintiff's service of copies on deputy prosecutors, and by substituting forged fraudulent court "orders" for those issued by judges. This practice has become so pervasive in plaintiff's cases that she now questions the legitimacy of any purported "order" communicated to her.

62. Defendant Marion Superior Court judges know that this obstruction of justice is taking place, but they have refused to take any corrective action, instead placing the burden on plaintiff to figure out ways to bypass the clerk to transmit her filings to judges. Pursuant to Indiana Administrative Rule 10, judges and the Clerk are collectively responsible for the integrity and security of court records. Judges may order the Clerk to comply with the rule.

63. Marion Superior Court judges use signature stamps because they find personally signing orders to be excessively burdensome. They can also then deny responsibility for the orders issuing from their courtrooms. It is plaintiff's opinion that anyone who does not wish to sign orders should be disqualified from serving as a judge.

64. As a result of Bepko's and others' legal malpractice, identity theft, and identity deception, plaintiff has not received a fair hearing of her claims in any case to which she has been a party. Thus, *res judicata* does not apply to any of the cases in which plaintiff has been plaintiff.

65. Plaintiff first began to become aware of, that is, to "discover" the scapegoating and the falsification of court documents in July, 2002, and was affirmatively informed of same by Marion County government officials in August, 2003 and October, 2003 in their filings in two of the cases in question, 1:03-cv-0952-DFH-VSS and 1:03-cv-1024-LJM-WTL, respectively.

66. Prior to then, plaintiff was constantly puzzled when receiving judicial decisions which were completely inconsistent with her legal arguments. In representing herself in the cases

listed in Exhibit 1, plaintiff has performed extensive legal research, spending many hours of time and effort to ensure that her filings were legally solid. Thus, it has been excruciatingly painful to learn that her filings have been completely disregarded by judges in favor of Bepko-generated drivel filed by identity thieves.

### C. Background: Indiana University

67. The racketeering activity against plaintiff began at IU, where plaintiff was employed in various academic positions from June, 1987 through June 30, 1996, the last three of those years as Assistant Professor of Pediatrics.

68. Bepko, Schreiner, and Broxmeyer, sex- and power-obsessed IU administrators and plaintiff's former supervisors, established and maintained a practice of *quid pro quo* sexual harassment within IUPUI. They used syndicate members who were law enforcement officials and judges, positions which carry significant intimidation potential, to intimidate faculty into complying. Plaintiff refused to comply with such practice and expressed strong opposition to it.

69. As a result of plaintiff's expressed opposition to the sexual harassment and refusal to comply with it, syndicate members took a number of vicious actions against plaintiff relating to her employment at IU:

a) In 1994 and 1995 they used university security to threaten and intimidate her away from accessing her laboratory at IU, thus destroying her research career, for which she had spent many years in education and training;

b) During the period July, 1995 through October, 1997 they secretly removed all true positive material from plaintiff's personnel files, replacing the correct documents reflecting plaintiff's real achievements with false defamatory allegations by Pescovitz and others, and purported psychiatric "diagnoses." This false defamatory information has been used to blacklist

16

plaintiff from all paid employment from 1996 up to the present. As plaintiff has more recently learned, the defamatory allegations and "diagnoses" were based on Pescovitz's behavior, not that of plaintiff;

c) In 2000, 2001, and 2002 they denied her admission to IU schools of law, despite the fact that plaintiff is far more qualified for the study and practice of law than any other applicant. Judges have rated plaintiff's real legal work as "better than some attorneys." Syndicate members do not want to admit that a woman could be a more competent attorney than they. Additionally, if plaintiff had a license to practice law, then her actions would be given legitimacy in syndicate members' eyes. Apparently, the denials of admission were rationalized by intentionally projecting Pescovitz's psychopathology and incompetence onto plaintiff. Two of plaintiff's lawsuits were brought to obtain relief for the illegal denial of admission to law school.

70. Syndicate member officials of the Marion County court system have also adopted a practice of sexual harassment within its component agencies. Because plaintiff opposed the sexual harassment and refused to be intimidated by the members of the Syndicate, the Syndicate launched a campaign to destroy plaintiff.

71. The scapegoating mentioned in paragraph 32 began at IU. Syndicate members misused plaintiff's identification information to allow Pescovitz, plaintiff's former alleged supervisor at Indiana University School of Medicine ("IUSM"), to fraudulently identify herself as plaintiff, and to engage in antisocial behavior in plaintiff's name. Plaintiff's identification information was obtained by Pescovitz from plaintiff's IU personnel files. Additionally, Newman used his position as prosecutor to publish plaintiff's social security number and date of birth in the public record via court documents easily accessible to anyone who asks, on approximately February 11, 1999 and August 31, 2001.

72. Pescovitz is a danger to society and should long ago have been committed to a psychiatric institution for the criminally insane. However, syndicate members kept her out on the streets by threatening to destroy the career of any mental health professional who dared to testify in support of her commitment, and of any judge who ordered her commitment. Syndicate members have used Pescovitz as a weapon to further their own personal interests, taking advantage of Pescovitz's ability to harass and harangue susceptible individuals into acceding to unreasonable demands just to get rid of her, her ability and inclination to instigate conflicts between people, sometimes leading to violence, and her ability and inclination to aggressively manipulate susceptible men with sex. Thus, syndicate members have endangered the community. Defendant judges have allowed them to do so.

### D. "Law enforcement" actions against plaintiff

73. Plaintiff became a member of the IHC in approximately April, 1992. Plaintiff contributed to the IHC building fund, as is required of all new members.

74. Upon joining IHC, plaintiff received a letter welcoming her to membership in IHC. The wording of the membership letter led her to believe that she was becoming part of a permanent "family," and that her contribution to the building fund gave her a stake in the future of the congregation. The letter gave her the expectation that she would have access to IHC for religious activities and for membership (as long as she paid membership dues) for the rest of her life.

75. In 1995 plaintiff contributed money to an IHC building remodeling project. Her name is on a plaque on the wall of the IHC lobby. In acknowledgment of her contribution, in July, 1995, plaintiff received a letter stating that her continued participation in IHC activities was anticipated.

76. Thus, plaintiff has had a property interest in accessing IHC for worship and other legitimate activities.

77. According to information available to plaintiff, during the period 1992 through 1998, IHC members and clergy were being stalked and otherwise abused by Pescovitz because she was not a member. From the time Pescovitz arrived in Indianapolis in 1988, she had been a member of Congregation Beth-El Zedeck. Apparently, the Reform Jewish movement had excluded her from its congregations due to her outrageous behavior, which did not solve the problem, it only transferred it.

78. The clergy, lay leadership, and congregants of IHC, rather than dealing directly with the problem of Pescovitz and trying to find a viable solution within the law, decided instead to use plaintiff as a scapegoat for Pescovitz's offenses, in collaboration with the other syndicate members. Plaintiff distinctly recalls Cantor Janice Roger mentioning a scapegoat with an air of malicious satisfaction. The intent obviously was not to solve the problem, but to obtain instant ego gratification through mass bullying, to vent their frustration on plaintiff. Plaintiff suffered numerous mean-spirited barbs from many IHC members.

79. IHC apparently has a long-standing practice of using its power and money to influence political and governmental affairs. Jewish individuals of weak character such as syndicate members Scott Newman, Gerald Bepko, Norman Lefstein, Hal Broxmeyer, Louis Rosenberg and of course Ora Pescovitz are installed in positions of government power from which they can easily be controlled and manipulated by IHC. IHC has arrogantly claimed that it could freely commit crimes without punishment by simply characterizing them as "religious doctrine." Plaintiff has obtained some evidence that IHC has bribed public officials to act in accordance with this untenable position.

80. IHC is a corrupt, materialisitic, abusive organization which seeks to convey the appearance of a religious association solely to obtain favorable tax status. IHC has been characterized by mental health professionals as "dysfunctional."

81. In 1994-1995 members of the syndicate pressured then-IHC senior rabbi Jonathan Stein to leave IHC, so that they could recruit one Eric Bram ("Bram"), a sexual harasser. The syndicate members wished to impose their choice of religious beliefs and practices on an unwilling congregation and collectively hoped to characterize their crimes as "religious doctrine" in order to evade the scrutiny of the courts. As a weak and easily-manipulated individual, Bram was an ideal accomplice.

82. Not recognizing Bram's ineptitude at the time, plaintiff sought pastoral counseling from him during the period January, 1996 through June, 1998, what she thought were confidential discussions.

83. To further punish plaintiff for her refusal to perform oral copulation on them and also for her expressed opposition to many antisocial IHC practices (for example, some IHC members engaged in a practice of intimidating other IHC members away from attending worship services), IHC collaborated with the syndicate members to bring and maintain four groundless prosecutions against plaintiff to have plaintiff excluded from IHC and plaintiff's son excluded from religious education.

84. During the period March, 1999 - March, 2000, syndicate members threatened to kidnap plaintiff for engaging in religious worship at the IHC, under the pretext of a "stalking prosecution," then-Marion Superior Court case number 49F16-9902-DF-025481. Syndicate members used Pescovitz to harass and harangue Bram into unreasonable fear of plaintiff based on Pescovitz's severe criminal insanity. Thus, Bram compliantly served as the alleged victim, using the

counseling mentioned in paragraph 82 as a basis for his complaint. So much for clergy-penitent confidentiality.

85. The Presiding Judge of Marion Superior Court Criminal Division 16, the courtroom to which the case was assigned, was Evan Goodman, a member of IHC and a member of the IHC Board of Directors at the time. He did not recuse himself and appoint a special judge as he should have done, but instead recruited Rosenberg, an abusive, incompetent individual who wished to use the bogus prosecution to further his own career ambitions, as magistrate in his courtroom to handle the case. As part of the prosecution, Rosenberg ordered plaintiff under threat of arrest to refrain from worshipping at the IHC.

86. During the prosecution, Rosenberg lost his temper and screamed at plaintiff when she tried to assert her legal rights. As a result, plaintiff asserted her right to have the case transferred back to the presiding judge, by moving for same at a hearing and by filing a written petition asking Judge Goodman to take the case. He refused to take over the case and appoint a special judge, forcing plaintiff to endure Rosenberg, who retaliated against plaintiff for her request by placing a false failure-to-appear notation in court computer records. That false notation remains in computer records to this day, despite plaintiff's efforts to have it removed.

87. Plaintiff, representing herself, was found not guilty of stalking by a jury. Pescovitz was the individual who really committed stalking. Plaintiff was prosecuted by Newman pursuant to a Marion County government-established religious doctrine that because Pescovitz is a rabbi's daughter, she is entitled to a scapegoat to take the punishment for her offenses.

88. From March 14, 2000 to May 9, 2000 syndicate members brought a groundless "emergency protective order" (then-Marion Superior Court case number 49F17-0003-PO-000415) submitted by the Marion County Prosecutor's Office and granted by Rosenberg against

plaintiff to prevent plaintiff from engaging in religious worship at IHC. The protective order was dismissed for lack of probable cause.

89. Rosenberg continues to hold the position of Marion Superior Court magistrate, presiding over a criminal court. The Marion Superior Court judicial leadership have the authority under Indiana law to dismiss him from his position, but have declined to do so.

90. On March 31, 2000, June 12, 2000, and November 13, 2000 received letters threatening that she would be arrested for worshipping at the IHC.

91. From April 13, 2001 until May 15, 2001 syndicate members using records falsified by the Marion County Clerk's Office, brought a groundless invasion of privacy prosecution against plaintiff to prevent plaintiff from engaging in religious worship at IHC (then-Marion Superior Court case number 49F16-0104-CM-085681). No charging information was ever filed. There was not even a hint of probable cause that plaintiff had committed invasion of privacy. Pescovitz was the real offender. With respect to plaintiff, the prosecution was motivated by pure malice on the part of Newman and some IHC members.

92. The stalking, emergency protective order, and invasion of privacy cases were transferred to defendant Judge Hammel's courtroom in approximately February, 2004. Plaintiff has sought to have the cases expunged from court records since she has committed no offense and was merely being used as a scapegoat, but Hammel has denied her motions. He even denied a motion which was not in the court file, as plaintiff's motion had been returned to her after filing by Sadler's office (plaintiff later learned that the clerk, instead of serving the extra copy which plaintiff had given her to place in the prosecutor's service basket pursuant to court practice, had placed the service copy in the case file in place of plaintiff's original copy).

93. In an order dated March 19, 2004, Judge Hammel chastised plaintiff for failing to successfully obtain a change of judge in the stalking prosecution, an example of the Marion Superior Court policy of blaming criminal defendants for judges' malfeasance. Plaintiff cannot order judges to do anything, but must accept their decisions. It is judges who have the power.

94. Presumably, the motions denied by Hammel were some of the Bepko-generated forgeries which were conveyed to him in place of plaintiff's real filings.

95. Hammel also ruled, in an order issued March 19, 2004 in case number 49G21-9902-DF-025481 that Marion Superior Court had jurisdiction to intervene in religious disputes, citing a provision of an Indiana statute, Ind.Code § 33-5.1-2-4 (1), which states,

> "Sec. 4. The [Marion Superior] court has the following jurisdiction:
>    (1) Concurrent and coextensive jurisdiction with the Marion circuit court in all cases and upon all subject matters..."

Hammel further ruled that prosecutors may use their office to resolve religious disputes if they disguise such intent by invoking a legal theory designated as a crime under Indiana law.

96. In his order of March 19, 2004, Hammel asserted that plaintiff has suffered no harm as a result of the fraudulent "criminal records" against her. Plaintiff has not observed Judge Hammel to volunteer to have a criminal record instituted against himself. Presumably, Judge Hammel considers plaintiff as a lowly woman to be unworthy of legal rights.

------------------------------------

97. On January 12, 2001, August 3, 2001, and August 10, 2001, plaintiff was threatened with physical harm for worshipping at the IHC.

98. From August 31, 2001 up to the present, defendants have pursued an "arrest" and "criminal prosecution" for alleged trespass to prevent plaintiff from engaging in religious wor-

ship at IHC, currently Marion Superior Court case number 49F07-0109-CM-177193. The case was initially assigned to Criminal Division 10, the Honorable Z. Mae Jimison presiding.

99. During the prosecution, plaintiff filed numerous motions to dismiss, arguing that the prosecution was brought to resolve matters of religious doctrine. All of plaintiff's motions were denied without explanation.

100. Plaintiff's first such motion was set for hearing on November 20, 2001. The hearing was conducted, not by Judge Jimison, but by one senior judge Charles Wiles ("Wiles"), who somehow, with the prosecutors' support, elbowed his way into the case without authorization. After barging into the case without any authorization to do so, Wiles then expressed extreme reluctance to conduct the hearing, asserting that he intended to deny plaintiff's motion without knowing anything about it.

101. At plaintiff's insistence, he did conduct a hearing, at which the reason for the prosecutors' support of him became apparent. Wiles' knowledge of law is so seriously deficient that he simply complied with the prosecutors' demands in every one of his rulings, on matters large and small. Plaintiff finally dislodged Wiles from the case by filing an appeal from his decision. Judge Jimison then took over the case at plaintiff's request. Wiles has never had any authority to take any action in that case. To plaintiff's knowledge, Wiles is still hearing Marion Superior Court cases.

102. In May, 2002, Marion Superior Court judge Rebekah Pierson-Treacy, presiding judge of Criminal Division 19, acquired jurisdiction over the case but she neither conducted any pretrial proceedings nor appointed a special judge to hear the case.

103. Syndicate member Zore, a civil division judge who had no legal authorization to conduct any proceeding in the case, elbowed his way in to conduct a trial on July 11, 2002. Zore

lacked jurisdiction to conduct the trial because jurisdiction over the case was vested in Judge Rebekah Pierson-Treacy at the time; under Indiana law only one judge may exercise jurisdiction over a case at any given time.

104. Plaintiff was not invited to Zore's trial; an identity thief was recruited to present false testimony in plaintiff's name. Zore, who knows who plaintiff really is, took bribes to conduct the fraudulent "trial." According to information from the Marion County Prosecutor's Office, the deputy prosecutor at the trial was one Kathy Infanger. Plaintiff does not know who she is.

105. Because the "prosecution" of plaintiff was based on matters of religious doctrine, Zore in his capacity as jury pool supervisor, used a religious test to recruit jurors who would be likely to support the prosecutors' position, based on the jurors' personal religious beliefs and practices. Zore took these actions with the approval of criminal elements within the IHC leadership. Plaintiff first learned of Zore's kangaroo court trial in September, 2003.

106. Also on July 11, 2002 a proceeding labeled a trial was conducted by Israel Cruz, whose position title is and has been at all times with respect to the trespass case (number 49F07-0109-CM-177193), commissioner. A commissioner functions as an assistant to judges, generally to conduct preliminary proceedings. Under Indiana law, commissioners may not conduct jury trials, receive jury verdicts, or issue judgments in criminal cases. At the end of the so-called trial, Commissioner Cruz said to the jury in a sarcastic tone of voice something to the effect of, "Now you know how the jury system *really* works," indicating to plaintiff that there had been additional serious irregularities in the proceeding.

107. If a defendant attempts to take appeal from a judgment of conviction signed by a commissioner, the appeal will be summarily dismissed (after payment of the $250.00 docketing

fee), regardless of whether the defendant has requested prior to trial that a judge conduct the trial. In this manner, the Indiana Supreme Court through its published opinions has established a procedural mechanism through which unscrupulous prosecutors and judges can engineer fraudulent convictions from which appeal is unavailable. This is yet another example of the Indiana policy of punishing criminal defendants for the errors and omissions of court officials. If a court cannot provide a judge to conduct a trial and sign a judgment, then why is the court in business at all?

108.  Zore collaborated with the clerk's office to enter a conviction against plaintiff into court records. To date, plaintiff has seen no signed judgment of conviction. Indeed, no judge is authorized to sign a judgment of conviction because no authorized judge conducted a trial.

109.  The Marion County clerk and low-level Marion Superior Court probation officers exerted unauthorized control over Judge Pierson-Treacy's signature stamp to forge documents to falsely represent to plaintiff that she was sentenced to probation. The Marion Superior Court Probation Department has generally perpetrated a practice of taking unauthorized judicial actions (they are not judges) by forging documents and threatening and intimidating defendants. With reckless disregard for defendants' rights, the judges of the Marion Superior Court have simply looked the other way.

110.  Because plaintiff, adopting the apparently untenable belief that documents purporting to be issued as part of a court proceeding were legitimately issued by a court, did not initially realize that the documents were forged, she filed numerous "post judgment" motions and a petition for post conviction relief, all of which were summarily denied by Judge Pierson-Treacy, but indicating that she had retained jurisdiction over the case.

111.  As a result of the forged documents, the Marion Superior Court Probation Department has been harassing plaintiff to pay them money which she does not owe.

112.  In approximately November, 2002, Judge Pierson-Treacy recused herself from the case, and Judge William Nelson ("Nelson") assumed jurisdiction over the case.

113.  On June 12, 2003 plaintiff filed a motion to dismiss the trespass case on the grounds that the case constituted impermissible court interference in religious practice, and that it had not been brought to legal trial within one year of charging, as required by Indiana law. The motion was denied by Nelson on June 19, 2003. Presumably, Nelson was denying a Bepko-generated filing, and not one submitted by plaintiff.

114.  In retaliation for plaintiff's motion, she received a notice in an envelope postmarked June 20, 2003 from the probation department stating that she was supposed to pay them $183.00 by May 10, 2003, thus setting the stage for fabrication of a "probation violation."

115.  Also in retaliation for plaintiff's motion, on June 27, 2003 an abusive probation officer telephoned plaintiff at her home to threaten physical violence against her if she did not pay $183.00 (which has since been increased by the clerk to $184.00 without explanation).

116.  Plaintiff sent the probation department a letter dated June 30, 2003 via certified mail, and which they received on July 1, 2003. In the letter, she promised to initiate federal racketeering litigation against probation officers and others if the case was not immediately dismissed.

117.  In retaliation for the letter, on July 7, 2003 plaintiff received a notice of probation violation which was file-marked July 1, 2003. The notice set a hearing for August 13, 2003. The chronological case summary alleges that the probation violation was ordered by the low-level probation officer, who is not a judge (she is also no longer on the case). The "order" is not signed by an identifiable judge.

118.  At the August 13, 2003 hearing, Nelson first recused himself from the case, thus re-linquishing jurisdiction over it, and then proceeded to "sentence" plaintiff to indefinite "proba-tion" in the absence of probable cause that plaintiff committed a crime. The intent of the "proba-tion" was to prevent plaintiff from worshipping at IHC, to punish her for refusing to perform oral copulation on male members of the syndicate, and to beat her into submission. The "probation" was approved by Adland. Even if plaintiff had been convicted of trespass, the statutorily-mandated maximum sentence is one year, which would have concluded July 10, 2003.

119.  The Indiana Supreme Court, on September 8, 2003, appointed special judge Jerry Barr to hear the case. He recused himself in early January, 2004 after taking no action.

120.  The Indiana Supreme Court subsequently, in February, 2004, appointed defendant Judge Pylitt as special judge to hear the case.

121.  Plaintiff filed yet further motions to dismiss the case and for production of the en-tire record, as required by Indiana law. Her motion to dismiss was denied in March, 2004 what plaintiff believes to be, based on signature comparisons, a forged "order."

122.  Judge Pylitt scheduled a hearing on "information of probation violation" for April 19, 2004.

123.  When plaintiff walked into the courtroom on April 19, 2004, a few minutes prior to scheduled starting time, she observed an individual in judicial robe, whom she identifies as Wiles, sitting on the bench, chatting with a deputy prosecutor and probation officers. Plaintiff walked in and identified herself to John, the bailiff. When Judge Pylitt arrived, Wiles left the courtroom, but the other individuals remained. Plaintiff wonders whether Wiles had conducted a duplicate hearing with an identity thief impersonating plaintiff.

124.  At the hearing, Judge Pylitt strongly suggested that plaintiff was not the one convicted on July 11, 2002 (which plaintiff knows), and that the individual convicted was taller than plaintiff and black. Plaintiff is Caucasian.

125.  Based on the information provided by Judge Pylitt at the hearing, plaintiff concludes that the individual convicted of trespass was deputy prosecutor Linda Major. She had handled the above-mentioned stalking case, so it is entirely possible that she has been repeatedly entering the IHC property after being told to stay away, to pressure IHC members into complying with the prosecutor's government-established religious practices. The prosecutor's office, unimpeded by any judge, has sought to use plaintiff as a scapegoat for Linda Major's misconduct.

126.  Linda Major's demeanor at the stalking trial was excessively aggressive. In her closing argument, she suddenly, without warning,, mentioned a gun, leading plaintiff to conclude that Linda Major has been going to IHC and threatening congregants, staff, and clergy with a gun. Plaintiff has received information that Linda Major has engaged in a practice of stalking rabbis and blaming plaintiff for her crimes. Plaintiff concludes that Linda Major and Brizzi are virulently anti-Semitic, seeking to use their positions to destroy the Indianapolis Jewish community.

127.  At the April 19, 2004 hearing, Judge Pylitt scheduled an evidentiary hearing to determine whether plaintiff was the individual convicted of trespass, and ordered plaintiff and the deputy prosecutor to prepare witness lists and share documents to be offered into evidence. If plaintiff was not convicted, which plaintiff knows she was not, then she could not legally be sentenced to probation, and there would then be nothing to violate. Since Judge Pylitt already knows that the convicted individual does not look like plaintiff, plaintiff questions why an evi-

dentiary hearing is necessary. He should have simply dismissed the case against plaintiff for failure to bring to trial within one year, as required by Indiana law.

128. The atmosphere of the hearing was congenial. and plaintiff left feeling that perhaps at last she would receive a fair resolution of her case. In response to plaintiff's expressed concern, Judge Pylitt assured her that all proceedings would be conducted in open court, and that she would receive full due process.

129. Thus, plaintiff was shocked to receive, on April 24, 2004, a threatening document file-marked April 23, 2004 which contained not only the previously-discussed discovery requirement, but also demands that plaintiff not leave the "jurisdiction of this court" and "comply with all requirements of probation." Nothing remotely like that was said at the hearing.

130. It is clear to plaintiff, based on comparisons with other documents, that the signature on the document is forged. Plaintiff is not required to obey "orders" forged by clerks and probation officers, or even by unauthorized judicial officers. The only individual authorized to issue orders in the case is Judge Pylitt. The intent of the April 23, 2004 "order" is to interfere with communications between plaintiff and Judge Pylitt, such that the content of the communications will be controlled by the clerk and the prosecutors.

131. The succession of judges who have had procedural jurisdiction over the trespass case (notwithstanding the fact that the Marion Superior Court lacks subject-matter jurisdiction to resolve religious disputes, regardless of the legal theory invoked) is Z. Mae Jimison, Rebekah Pierson-Treacy, William Nelson, Jerry Barr, and Bernard Pylitt. None of them has conducted a trial.

132. The affidavit for probable cause in the stalking case, number 49G21-9902-DF-025481 was sworn and signed by Bram, a private citizen, and did not meet the statutory require-

ments for an affidavit for probable cause. Neither the affidavit nor the charging information alleged any action by plaintiff that would constitute an offense.

133. The affidavits for probable cause justifying the arrests (actually kidnapping and criminal confinement) in the invasion of privacy and trespass cases against plaintiff (numbers 49G21-0104-CM-085681 and 49F07-0109-CM-177193) contain fabricated allegations and were seriously defective procedurally. Both had been sworn and signed by deputy prosecutors who were not present at the scenes of the so-called "crimes," rather than by the arresting officer as is normally the case. The affirmation in both affidavits stated as follows: "I swear or affirm under the penalties for perjury that the above facts are true to the best of my knowledge and belief and that I learned these facts from another law enforcement officer." The affidavits do not specify who that other law enforcement officer may be.

134. No one with any personal knowledge testifies as to the truthfulness of the allegations in the affidavits, or to the reliability of their source, yet it is apparently routine practice in Marion Superior Court to "find" probable cause based on such affidavits. In plaintiff's experience, judges have acted merely as rubber stamps for decisions of prosecutors and sheriff's deputies. Many judges are former prosecutors who continue to behave like prosecutors rather than judges.

135. Plaintiff has seen two other affidavits for probable cause in two other Marion Superior Court cases prepared in the same manner: *State of Indiana v. William Troutman*, case number 49F17-0206-CM-181380; and *State of Indiana v. William E. Ross*, case number 49G06-0006-104260. Based on plaintiff's examinations of the records and communications with the defendants and one of the alleged victims in these two cases, the affidavits contain completely fabricated accusations. Yet both defendants were convicted in the absence of even probable cause.

31

William Troutman was tortured into pleading guilty to a crime he did not commit. William Earl Ross was convicted after a court trial of crimes committed by another individual, who, to plaintiff's knowledge, remains free.

136.   Troutman and Ross were victims of extremely ineffective assistance of counsel by public defenders who essentially collaborated with prosecutors against them (out of frustration, Ross ended up proceeding *pro se*). Plaintiff would have liked to help the defendants assert their rights, but she has been very limited in what she could do since she is not an attorney.

137.   Because the alleged prosecutions were, in reality, criminal actions designed to threaten and intimidate plaintiff and to extort money from her, plaintiff was denied a full and fair opportunity to litigate the cases in Marion Superior Court. Because no actual judgment was rendered by a judge in case number 49F07-0109-CM-177193, in fact, there is no signed judgment at all, plaintiff could not take appeal. There was nothing from which to appeal.

138.   On January 21, 2004 plaintiff submitted and filed original action number 49S00-0401-OR-36 with the Indiana Supreme Court describing numerous examples of Marion Superior Court judicial officers acting in excess of jurisdiction or failing to act when they had a duty to act in the criminal prosecutions against plaintiff, including a request that the Indiana Supreme Court step in to resolve case number 49F07-0109-CM-177193. She spent many hours researching and preparing the petition and supporting brief, taking care to comply punctiliously with the rules established by the Indiana Supreme Court. Plaintiff personally communicated with a staff attorney of the Indiana Supreme Court prior to submitting the petition, affirmatively identifying herself. She then personally submitted the petition and supporting documentation to the same staff attorney, so the Indiana Supreme Court would have reason to know who she really was.

139.  The action was summarily dismissed without a hearing on the basis that plaintiff had not included the required allegations. That simply was not true. Plaintiff was devastated after all of her hard work to have her efforts so casually brushed off. Clearly, the Indiana Supreme Court based its decision on Bepko/Newman-generated forgeries and portions of trial court records withheld from plaintiff, and not on plaintiff's submissions. The only documents made available to plaintiff and placed in the public record are plaintiff's filings and the Indiana Supreme Court's ruling.

140.  The fraudulent computer records relating to the bogus prosecutions against plaintiff have been communicated to national databases, with intent to permanently harm plaintiff's reputation nationwide. It goes without saying that a "criminal record" impairs an individual's liberty to go about normal life activities, affecting ability to obtain employment, social interactions, etc.

141.  Thus, syndicate members, with the approval of defendant judges, have relentlessly harassed plaintiff with frivolous litigation. As public officials, prosecutors may pursue endless frivolous litigation at no cost to themselves, unlike private plaintiffs who must pay a filing fee and other expenses of litigation. Defendant judges can stop the prosecutor's abuse of his office for such illegitimate purposes as instituting government-established religious practices by summarily dismissing clearly frivolous prosecutions, and admonishing the prosecutor that he will be held in contempt of court for refiling such cases. Thus far, they have declined to do so.

142.  Plaintiff remains in danger of being criminally prosecuted for engaging in religious worship. In fact, syndicate members expressly threatened as much in October, 2001.

143.  The frivolous and malicious prosecutions against plaintiff are part of the Sadler-Brizzi scapegoating and entrapment of innocent citizens schemes. These practices have not only

wasted taxpayer money, but they have also caused an *increase* in crime in Marion County since Brizzi and Sadler took office. Brizzi and Sadler let the real criminals run free.

**E. Other religion-related matters**

144.  Pescovitz's father is Rabbi Richard Hirsch, a Reform Jewish rabbi whom plaintiff assumes was trained at the HUC-JIR. Instead of acknowledging Pescovitz's severe mental illness and antisocial behavior and allowing ameliorative intervention by the courts and mental health professionals when Pescovitz was young and treatment might have been effective, Hirsch moved his family to Israel, a country which is governed according to the tenets of the Jewish religion. Apparently, in the Israeli legal system, rabbis and their children are given special consideration, such that Pescovitz was permitted to freely engage in antisocial behavior without fear of punishment. In this manner, Hirsch instilled in Pescovitz a belief that she was not required to conform to the behavioral norms of civilized society. Anyone who could create a monster such as Pescovitz and unleash her on society must surely be suffering from significant mental disability, rendering him unfit to serve as a rabbi.

145.  HUC-JIR has perpetrated a long-standing pattern of selecting and ordaining abusive, severely psychologically-impaired deviates as clergy and instructing them that they are not required to comply with secular laws. The abuse has harmed the entire Indianapolis community including plaintiff as described above. Examples of abusive Reform Jewish clergy are Rabbi Richard Hirsch, IHC rabbis Eric Bram, Ilana Baden, and Jonathan Adland, and IHC Cantor Janice Roger. Their times of matriculation at HUC-JIR span many years, up to the present. All of them have exhibited extreme arrogance, disdain for the rights and feelings of others, and disregard for the law.

146.   Former IHC rabbis Jonathan Stein and Larry Milder were not abusive, but they were weak and unable to effectively lead the congregation, even with respect to religious matters.

147.   In plaintiff's experience, the only IHC rabbi who has exhibited strength and real competence is former assistant rabbi Geoffrey Dennis.

148.   URJ published an article about sexual harassment within Reform Jewish congregations in its quarterly journal in 1994. Plaintiff has not seen any real effort on the part of URJ to prevent such abuse of power.

149.   Plaintiff wrote a letter to Rabbi Eric Yoffie, President of URJ, in January, 2000 to complain about Bram and his groundless stalking complaint. Plaintiff received no response, nor did she observe URJ to take any corrective action in response to her letter. In fact, after Bram's IHC contract was not renewed, he was given a similar position in a congregation in Ohio. Thus, it is the practice of URJ to demean, humiliate, and abuse women. Plaintiff grew up in the Reform Jewish faith, but she no longer wishes to associate with those whom she now realizes consider themselves to be above the law.

150.   URJ continues to accept IHC as a member congregation, thus tacitly approving and facilitating IHC's illegal activities.

151.   Because plaintiff was threatened and intimidated away from worshipping at IHC, and because she wants nothing to do with that corrupt organization, she began worshipping at Congregation Beth-El Zedeck in September, 2003.

152.   Congregation Beth-El Zedeck, in contrast to IHC, has generally been friendly, welcoming, and caring. The rabbis, Rabbis Dennis and Sandy Eisenberg Sasso (hereinafter collectively, the "Sassos" and individually referred to within the Jewish community as "Rabbi Dennis"

and "Rabbi Sandy"), the world's first husband-wife rabbi team, are highly respected and eminently qualified for their positions. They received their education and training at the Reconstructionist Rabbinical College, which is a completely separate institution under completely separate leadership from HUC-JIR, and which apparently does a far better job of selecting and training rabbis than does HUC-JIR.

153. Congregation Beth-El Zedeck has one problematic characteristic: it has a propensity for imitating the actions of other Jewish congregations in the Indianapolis area, particularly those of IHC. Plaintiff cannot understand this; IHC is certainly not a role model worthy of emulation.

154. This character flaw in the Beth-El Zedeck membership has been exploited by syndicate members. For example, a few years ago, plaintiff helped to effect Bram's departure from IHC because he personally was unqualified for the position of senior rabbi. Around that time, syndicate members, particularly Beth-El Zedeck troublemaker Alan Schwartz (who is not a member of that congregation), began instigating dissatisfaction with the Sassos. In their typical "me too" fashion, the gullible Beth-El Zedeck members attempted to enlist plaintiff as a scapegoat to assist them in their misguided endeavors. Recognizing their actions as resulting from illegal government interference in the affairs of a religious association, plaintiff declined to participate. The Beth-El Zedeck member who has particularly succumbed to the hoax perpetrated by IHC is Nonie Vonnegut-Gabovitch, wife of one of defendant Beth-El Directors.

155. In December, 2003 plaintiff decided she wanted to join Beth-El Zedeck, in large part because she was so favorably impressed with the Sassos, and submitted a membership application. She received a letter enthusiastically welcoming her to membership, thus creating a property interest in membership in Beth-El Zedeck. A true and accurate copy of the letter which

36

plaintiff received is attached hereto as Exhibit 2. One of the Beth-El Directors contacted plaintiff to decide what her dues would be, also in December, 2003.

156. Pursuant to the acceptance into general membership, plaintiff joined the Beth-El Zedeck Sisterhood in January, 2004, and paid membership dues.

157. In February, 2004, after syndicate members learned of plaintiff's welcome into membership at Beth-El Zedeck, plaintiff inexplicably received a letter denying her membership. Because of this denial, plaintiff was not invited to participate in any Beth-El Sisterhood activities during the period February, 2004 through April, 2004, even though she had paid dues.

158. Plaintiff has continued worshipping at Beth-El Zedeck, but because of the pattern of government-sponsored terrorism against her for peacefully engaging in religious worship, as de- scribed supra, plaintiff feels very uncomfortable worshipping there without being a member. In fact, in the two weeks prior to submitting this complaint, she has stayed away out of fear. Given the Brizzi-Sadler practice of aggressive entrapment, and given the government's efforts to choose Beth-El Zedeck's spiritual leaders for it, plaintiff is concerned that criminal prosecutions will again be employed to bar her from engaging in communal religious worship.

159. Furthermore, as a non-member, plaintiff cannot serve on congregational committees or participate in other activities, such as the choir.

160. Plaintiff has sought to talk to the Sassos, both of them together, about some of the matters described in this complaint, but has also been denied the opportunity to do this. Plaintiff knows she cannot talk to Rabbi Dennis alone, out of concern that Brizzi's Task Force for the Extermination of Jews, assisted by defendant Marion Superior Court, will fabricate criminal charges against one or both of them for doing so.

161. On March 27, 2004, defendant Adland stalked plaintiff at a Beth-El Zedeck worship service. At that time, he would be expected to have been conducting worship services at IHC. He also, shortly prior to then, wrote a letter to the local newspaper, in which he conferred on himself the right to murder anyone whom he fantasized was out to get him. Since he has used plaintiff as a scapegoat for Pescovitz, plaintiff is terrified of him, considering him to be a paranoid, dangerous individual. She has sought a protective order against him.

**F. Other associations**

162. Plaintiff's son Ben (he is now over eighteen years of age) attends Brebeuf, which is located within one mile of plaintiff's home. Although Ben's experience there has generally been positive, plaintiff initially noted some unexplained hostility toward her among some Brebeuf parents and toward her son among some Brebeuf students. Further, Bram was sent there in September-October, 2000 to harass plaintiff.

163. Plaintiff has contributed to Ben's tuition and fees at Brebeuf.

164. Brebeuf characterizes itself as a college preparatory school, advertising in its promotional materials that 99% of its graduates go on to college, some of them to the most prestigious colleges in the country. Thus, Brebeuf creates an expectation that it will not only prepare students academically for college, but that it will also help them gain admission to the best institutions for which they are qualified.

165. Syndicate members have recruited one Sarah Jackman ("Jackman") to cause disruptions there. Ben's sole interaction with her was through the swim team, of which Jackman was assistant coach and he was a member during the 2002-2003 and 2003-2004 academic years. Jackman also teaches Spanish at Brebeuf.

166.  In approximately January 2004, Jackman maliciously used false allegations of sexual misconduct presented directly to Fr. Benjamin Hawley, the president of Brebeuf, about Mark Lambert, the head swim coach, to effect his suspension and ultimate resignation in the middle of the swimming season. Lambert was in reality quite capable and well-liked by the students. His departure impaired their ability to compete effectively in swim meets. It was a case of vicious back-stabbing.

167.  Plaintiff was so shocked by Jackman's behavior that she wrote a letter to Fr. Hawley, with copies to other relevant Brebeuf administrators and the boys' and girls' swim team moms, expressing concern about the false allegations, and advocating Jackman's removal from the swim program. In plaintiff's opinion, Jackman should be fired altogether, although plaintiff did not specifically express that opinion in the letter. Plaintiff has not received a response to her letter, nor was Jackman removed from the swim program.

168.  Given syndicate members' propensity for severe retaliation at even the slightest hint of criticism, plaintiff is concerned that Jackman will attempt to cause physical harm to her, and to use syndicate members' law enforcement powers to threaten and intimidate her away from attending Ben's graduation and related activities.

169.  In fall, 2003 Ben applied to a number of universities for entrance in fall, 2004. Just prior to then, plaintiff received information that defamatory gossip about her alleged mental health problems (actually Pescovitz's pursuant to the scapegoating and identity theft mentioned in this complaint) would be communicated to colleges to which Ben applied. His first choice was Columbia University, which did not grant him an interview, in contrast to his classmates who applied there, and rejected his application in December, 2003. Ben also applied to Cornell University, from which plaintiff received her doctorate. Cornell specifically stated in its application

materials that "legacies" are given special consideration. Ben received a rejection letter from Cornell in April, 2004. The letter mentioned his family ties to Cornell.

170. Ben is very qualified for study at both Columbia and Cornell. Unlike the case with the majority of applicants, Ben's classmates said of him, and which plaintiff has observed, that he has demonstrated a real enthusiasm for learning, in addition to obtaining excellent grades and participating in extra-curricular activities. He has characterized integral calculus as "easy." Ben is accustomed to an environment of high-achieving students, as 1/3 of his class in the 2003-2004 academic year has achieved grades comparable to his (no, it is not due to grade inflation).

171. The Brebeuf guidance department was supposed to communicate the positive information to college admissions committees. Many Brebeuf students did not gain admission to prestigious institutions for which they were qualified. The guidance counselors were fired.

172. Plaintiff has saved enough money to pay a significant portion of Ben's college tuition, more than one year. She wishes to use that money for the best education for which Ben qualifies.

173. Plaintiff believes that Ben was denied admission to Columbia and Cornell based on false malicious gossip communicated by Jackman, who is in a position to find out to which schools Ben applied by examining guidance department records. Plaintiff does not have much regard for colleges which base their admissions decisions on gossip, but Ben's applications should receive fair evaluations.

174. Ben has decided to attend the University of Michigan, which accepted him a mere three weeks after he applied, and which, after visiting the campus, he now says he would choose over Cornell. Plaintiff is concerned that Jackman, in collaboration with other syndicate members

will now try to disrupt Ben's interactions with the University of Michigan, to prevent him from matriculating there.

175. Given Jackman's egregious behavior, plaintiff considers her to be unqualified to interact with young people.

176. Plaintiff has been a member of a number of organizations during the past ten years, among them the National Council of Jewish Women and the local Smith College Alumnae Club. Apparently instigated by syndicate members, members of those organizations Nonie Vonnegut-Gabovitch, Joan Fitzgibbon (also an IHC member), and Jennifer Weyreter have impeded plaintiff's participation in the activities of the organizations.

177. Plaintiff moved into the College Park subdivision in Marion County in August, 1991. Living in an area with many mature trees and interacting with her neighbors has brought plaintiff some satisfaction over the years. Syndicate members have maliciously and vindictively sought to disrupt that. They recruited two individuals of questionable character, Elizabeth Bassett and Janice Mitchell-Hankins to inveigle their way onto the Board of Directors of plaintiff's homeowners association. As directors, they attempted to take a significant portion of the association reserve fund, which is needed for many capital expenditures as well as for some operating expenses, for purchase of excessively extravagant playground equipment against the wishes of the membership, to destroy the natural beauty of the common areas by neglecting and/or harming trees, and to instigate dissention among the homeowners during the period September, 2002 through June, 2003.

178. Syndicate members recruited Nancy Poore ("Poore"), one of plaintiff's neighbors who claims to be an attorney to participate in the dissipation of association funds by employing purported "legal arguments" which plaintiff knows, based on her own legal research, were com-

pletely untenable. Poore also, for claimed reasons which sounded suspicious, sent one of her children to Brebeuf after Ben became a student there.

179. Plaintiff was forced to pursue litigation, *Srivastava v. College Park Club, Inc.*, Marion Superior Court case number 49D06-0304-PL-000708, to bring reason back into the management of association affairs. This cost both plaintiff and the homeowner's association money which could have been used for other purposes. Additionally, during that time period more than $10,000 mysteriously disappeared from association funds. To date, no explanation has been forthcoming.

180. As if all the injuries already described are not enough, syndicate members have also induced neighbor Saroj Shah to spy on plaintiff, have knocked down her mailbox twice (a federal crime), induced neighbors Bob and Teresa Danielson, who are apparently anti-Semitic (they send their children to Christian schools), to kill trees and flowers on plaintiff's property, and have harassed and harangued plaintiff's elderly parents to incite conflict within plaintiff's family.

181. Plaintiff has reason to believe that syndicate members have wiretapped plaintiff's telephone without probable cause, to obtain information about plaintiff's personal life, and to interfere in and disrupt plaintiff's interactions with family and friends, and to intimidate others away from associating with plaintiff. Plaintiff now tries to restrict her telephone and e-mail use to essential communications.

182. Despite syndicate members' relentless attacks on plaintiff in an effort to completely destroy her life, causing her considerable pain and distress, plaintiff has not turned to substance abuse as a relief mechanism, unlike syndicate members. The extent of plaintiff's alcohol consumption is an occasional glass of wine or two with dinner (which is legal as she is over 21 years of age). Plaintiff has never used illegal drugs, although she has obtained some evidence that Pe-

scovitz drugged plaintiff's coffee without plaintiff's knowledge when they were employed in the same environment at IUSM.

183. Plaintiff has instead sought to obtain relief for these injuries through litigation, but defendant courts and judges have not allowed her to do so.

**G. Marion Superior Court civil cases**

184. Plaintiff initiated litigation against IHC in Marion Superior Court on April 13, 2000. The case was docketed as number 49D03-0004-CT-000580 and assigned to Civil Division 3, defendant Judge McCarty presiding.

185. Defendant's counsel Paul Fulkerson ("Fulkerson"), by his own admission, collaborated with the clerk to "dismiss" the case on November 1, 2000, using Judge McCarty's signature stamp to "sign" an alleged order dismissing the case without prejudice in response to a motion for voluntary dismissal filed by plaintiff.

186. Plaintiff thought at the time that the case had actually been dismissed.

187. On January 16, 2004, after realizing that case number 49D03-0004-CT-000580 had not actually been dismissed by a judge, plaintiff filed a withdrawal of her motion to dismiss the case and a motion to either proceed with the case or to transfer it to Civil Division 6 (see below). To date, plaintiff has not received any ruling from Judge McCarty on that motion.

188. On February 24, 2004 plaintiff filed a praecipe to the Clerk pursuant to Ind.Trial Rule 53.1 to submit case number 49D03-0004-CT-000580 to the Indiana Supreme Court for appointment of another judge for failure to rule on plaintiff's January 16, 2004. Shortly thereafter, plaintiff received a copy of a denial of her praecipe signed by Sadler. A notation on the denial asserts that a copy was provided to Judge McCarty.

189.  Thus, the case remains open, but Judge McCarty has declined to rule on any motion or transfer it to another judge.

190.  Because plaintiff initially thought the "order" of November 1, 2000 was legitimate, she initiated new litigation stating essentially the same claims against essentially the same defendants. The case was docketed as number 49D06-0011-CP-001662 and assigned to Civil Division 6, defendant Judge Carroll presiding.

191.  Judge Carroll has taken numerous unjustified actions which are inconsistent with the law, including awarding more than $16,000 of plaintiff's money to Fulkerson and his boss Richard Skiles, because they have conferred on themselves a general right as defense counsel to use civil litigation to steal plaintiffs' money, or alternatively to use threats of same to induce plaintiffs to voluntarily dismiss meritorious claims. Judge Carroll has also allowed Fulkerson and Skiles to maintain frivolous counterclaims, the purpose of which is to use the litigation to obtain even more money for themselves and their co-conspirators (they have contributed several thousand dollars to Newman's and Brizzi's election campaigns).

192.  Plaintiff took two appeals to the Indiana Court of Appeals, which affirmed Judge Carroll's decisions and awarded appellate attorney's fees against plaintiff, based on a falsified record and forged briefs submitted in plaintiff's name. The Court of Appeals has reason to know who plaintiff really is and what she really submitted.

193.  In November, 2002 defendant Indiana Court of Appeals published its opinion in appeal number 49A02-0112-CV-883, which was based on forged documents submitted in plaintiff's name and Pescovitz's misconduct, and which was inconsistent with existing law, in the *Northeastern Reporter*, in order to subject plaintiff to public humiliation.

194. After performing extensive legal research, plaintiff realized that Judge Carroll did not have jurisdiction over the case under Indiana law because the same, earlier-filed case is pending in another court of coordinate jurisdiction. She filed a number of motions to dismiss the case pursuant to Ind.Trial Rule 12 (b)(8) during the period August, 2003 through March, 2004, but Judge Carroll denied them, therby retaining the illegal counterclaims.

195. As plaintiff argued in appeal number 49A02-0305-CV-00456, if the trial court lacked jurisdiction to hear the case at all, then the Court of Appeals lacked jurisdiction to review trial court decisions, except to rule that it lacked jurisdiction. In that appeal the Court of Appeals refused to allow plaintiff to file a reply brief, in violation of court rules. Because the Court of Appeals has rendered its decisions based on forged briefs submitted by identity thieves and a falsified trial court record submitted by an unscrupulous clerk, the Indiana Court of Appeals disregarded plaintiff's arguments.

196. In January, 2003 plaintiff initiated litigation against defendant Wooden & McLaughlin and other attorneys, including Skiles and Fulkerson, to obtain relief for their participation in some of the injuries described in this complaint. The case was docketed as number 49D01-0301-CT-000143 and assigned to Marion Superior Court Civil Division 1. At the time, Steven Frank was the presiding judge of the courtroom.

197. On July 3, 2003, plaintiff voluntarily dismissed all claims as to all defendants, thus terminating the proceedings.

198. Plaintiff subsequently received two documents entitled "Order Granting Motion to Dismiss" and "Order," apparently prepared by Fulkerson. The documents were file-marked July 21, 2003 and "signed" with a signature stamp bearing Judge Frank's name, but not actually signed by anyone. One of the documents purports to dismiss plaintiff's claims as to all defen-

dants with prejudice. The other commands plaintiff to seek permission of Judge Frank prior to filing any future lawsuits against those defendants, an action which Judge Frank lacked jurisdiction to take, even if he had signed the original order, which, plaintiff learned in January, 2004, he might have done.

199.   Plaintiff does not consider purported "orders" signed with signature stamps to be legally binding, and therefore ignored them. Even a chimpanzee can stamp a document with a signature stamp. Plaintiff now concludes that Sadler deliberately sent plaintiff the forged "order" with the intent that plaintiff would not obey it, so that it could be used as a justification to extort money from her, yet another manifestation of the clerk's policy of entrapment.

200.   Plaintiff initiated new litigation stating civil rights claims against one of the same defendants and others on September 9, 2003. Wooden & McLaughlin attorneys John Nell ("Nell") and Maureen Ward ("Ward") appeared on behalf of IU-associated defendants in the case. The case was originally assigned to Civil Division 6, case number 49D06-0309-PL-001592.

201.   The defendants represented by Nell and Ward filed motions to dismiss and for attorney's fees, apparently based on some of the forged documents described in § B, above.

202.   On September 25, 2003 plaintiff voluntarily dismissed all claims as to all defendants except Kenneth Fuchs, an in-house attorney at Prudential Securities (now Wachovia) who had divulged information about plaintiff's account and authorized payment of assets to syndicate members without plaintiff's consent, in response to clearly forged "court documents."

203.   The case was transferred to Civil Division 1, the Honorable Steven Frank presiding, in October, 2003, and became case number 49D01-0310-PL-001914. This case designation vio-

lates the rules established by the Indiana Supreme Court for case numbering. Plaintiff did not receive notice from the Clerk of the transfer.

204. Judge Frank retired as of January, 2004; his newly-appointed replacement was sworn in on January 12, 2004, and defendant Judge Bradford, who had previously been in the criminal division, assumed jurisdiction over Civil Division 1.

205. Plaintiff received notice that a hearing on pending motions would be conducted on January 28, 2004. She assumed that it would be conducted by Judge Bradford, who, she observed upon arrival for the hearing, was sitting in his courtroom conducting hearings on that day.

206. Frank, who was no longer a judge and therefore had no authority to take any judicial action, conducted the hearing. As an individual with no greater authority than plaintiff herself, Frank "found" plaintiff in contempt of court and "awarded" attorney's fees against her. Plaintiff assumes the money would go to syndicate member Bepko, who was not named as a defendant, for his unwanted "representation" of plaintiff.

207. After examining all of the actions taken, plaintiff has determined that the case is still open, with Kenneth Fuchs as the sole remaining defendant.

208. Plaintiff subsequently, during the period February, 2004 through April, 2004, filed motions to vacate the "judgments" in case numbers 49D01-0301-CT-000143 and 49D01-0309-PL-001914, and to continue to hear her claims against Kenneth Fuchs, but has received no response from Judge Bradford.

209. On or about March 27, 2004 plaintiff received from Wooden & McLaughlin a document entitled "Order and Summons" which was file-marked March 26, 2004 and stamped with Judge Bradford's signature stamp, along with a motion for same. The "order" ordered

plaintiff to answer interrogatories about her financial assets, which is none of Wooden & McLaughlin's concern.

210. On or about April 22, 2004 plaintiff received from Wooden & McLaughlin a document entitled "Order and Summons" which was file-marked April 15, 2004 and stamped with Judge Bradford's signature stamp, along with a motion for same. The "order" ordered Wachovia Securities to answer interrogatories about plaintiff's financial assets in its custody, which it apparently declined to do.

211. In March, 2004 plaintiff attempted to submit a petition for order of protection against IHC member Gary Vigran to Judge Hammel's courtroom, because Vigran had perpetrated the offense of stalking against her. Marion Superior Court has apparently designated Judge Hammel's courtroom to handle protective order petitions. Her petition was denied by court staff. Apparently, Judge Hammel allows court staff to take judicial actions on his behalf.

212. Plaintiff subsequently submitted petitions for orders of protection against Vigran and Adland directly to Judge Carroll, as permitted by the relevant statute. To date, she has received no ruling, but she has not observed Adland at Beth-El Zedeck.

213. Plaintiff has learned that many protective order petitions are diverted by Sadler's office to the prosecutor's office for triaging, actions which are not provided for in the statute (the protective orders are civil actions). Plaintiff has observed that the prosecutor's office is unfamiliar with the statutory provisions, arbitrarily denying protective orders to those who might really require them. Based on plaintiff's knowledge of Brizzi's modus operandi, those seeking protective orders have been put in danger of bogus prosecutions against them by informing the prosecutor of their existence.

214. Plaintiff receives monthly child support which by law must be transmitted through Sadler's office. In February, 2004, plaintiff received in the mail a duplicate check, even though there were no funds in her account to pay out on the check. When plaintiff inquired as to what action she should take, a clerk in Sadler's office flippantly advised her to cash it, which plaintiff did not consider to be the appropriate course of action. After having to explain repeatedly what had happened, plaintiff was finally advised to return the extra check to the Clerk's office, which she did. Plaintiff surmises that issuance of duplicate child support checks has been used to entrap unwary recipients into "committing crimes" by cashing the checks.

215. During the period May, 2003 through February, 2004, plaintiff filed complaints about the malfeasance of syndicate attorneys and judges with the Indiana Supreme Court Disciplinary Commission and the Indiana Commission on Judicial Qualifications, respectively. To plaintiff's knowledge, no corrective action was taken in response to her complaints.

**H. Federal civil cases**

216. Starting in May, 1997 plaintiff pursued litigation in the federal court system to obtain relief for the injuries described in this complaint. She spent a considerable amount of time researching the relevant statutes, court rules, etc. and preparing complaints and arguments in accordance with what she learned from her research.

217. Almost all of the cases were ultimately dismissed in their early stages, without allowing plaintiff to engage in any discovery. In one case, number IP98-0242 C H/G, District Judge David Hamilton himself dismantled plaintiff's entire case by arbitrarily striking a critical filing from the record. He then, with the assistance of Wooden & McLaughlin attorneys, awarded "attorney's fees" to syndicate member Bepko, using as justification that plaintiff's claims were "frivolous." At a hearing on the matter in August, 1999 he screamed at plaintiff,

even though she had done nothing wrong., which caused her significant emotional distress. Plaintiff knew she had stated valid claims, and that they were rendered procedurally "frivolous" by Judge Hamilton's own actions, not by anything she had done.

218. In February, 2003 plaintiff filed a motion pursuant to *Fed.R.Civ.P.* 60(b)(4) to re-open case number IP98-0242 C H/G, arguing that she had been denied due process. In an order dated September 30, 2003 Judge Hamilton struck plaintiff's motion from the record, denying plaintiff even the minimal courtesy of a ruling on it. Plaintiff then filed a motion requesting that Judge Hamilton recuse himself from the case, which was denied.

219. Appeals brought no relief, except in one case, *Srivastava v. Louis Rosenberg, et al.*, number 1:03-cv-0421 JDT-WTL, United States Court of Appeals for the Seventh Circuit case number 03-3827, which was so clear-cut that an appeal should not have even been necessary.

220. As plaintiff learned in March, 2004 from the Notice of Issuance of Mandate in appeal number 03-3827, the judicial decisions in all of the cases had been based on "*in camera material*" to which plaintiff has not been granted access and about which she was never informed. A true and accurate copy of the Notice of Issuance of Mandate which plaintiff received from defendant Seventh Circuit is attached hereto as Exhibit 3.

221. Plaintiff filed a motion requesting that she be granted access to the "*in camera material*", which was denied by District Judge Tinder. What are the judges hiding?

222. In another appeal, number 03-2202, defendant Seventh Circuit returned, in addition to four volumes of pleadings, some "loose pleadings" which may also have included documents and transcripts upon which judicial decisions were based and to which plaintiff was not granted access. The docket sheet of that case alleged that the District Court record is "oversized." Plaintiff learned from one of the opposing counsel in June, 2003 that a conference was conducted in

the District Court in the case from which the appeal was taken, *Srivastava v. Cottey, et al.*, number IP01-0744-C-M/L at which two judges were present. Plaintiff was never invited to any conference at which two judges were present.

223.  Instead of providing relief to plaintiff in accordance with the law, District Court judges have chosen to attack and ridicule her, and completely deny her access to the courts. Of course, the judges have powerful, prestigious positions with lifetime appointment, comfortable salary, health insurance, and pension, while plaintiff is just a lowly unemployed woman, so they do not care.

224.  Those who have injured plaintiff as described in this complaint hold positions of respect and esteem, positions in which plaintiff expects the occupants to act not merely in compliance with the minimal requirements of the law, but to voluntarily hold themselves to a significantly higher standard of behavior and integrity. Instead, they have chosen to use their positions to evade the law, and to grant themselves special permission to do so. Plaintiff is extremely disappointed with this dereliction of duty, and disillusioned about the character of those who hold positions of responsibility and trust.

## IV. STATEMENT OF LEGAL CLAIM

225.  Plaintiff supports the following claims by reference to the previous paragraphs of this complaint:

226.  **Count I**. During the period February, 2004 through April, 2004, defendant Judge Hammel has deprived plaintiff of her liberty to pursue normal life activities as a law-abiding citizen without due process of law by refusing to dismiss and expunge from court records what were clearly frivolous and malicious prosecutions against her, in violation of the Fourteenth Amendment to the *Constitution of the United States*.

227. **Count II**. During the period February 25, 2004 up to the date of filing this complaint, defendant Judge Pylitt, by refusing to dismiss Marion Superior Court case number 49F07-0109-CM-177193, has punished plaintiff for a crime which he knows she did not commit, depriving her of her right to free exercise of religion and freedom of association, in violation of the First, Eighth, and Fourteenth Amendments to the *Constitution of the United States*.

228. **Count III**. During the period April 19, 2004 through April 23, 2004, as part of Marion Superior Court case number 49F07-0109-CM-177193, Sadler, in collaboration with Marion Superior Court probation officers, IHC, and Adland sent plaintiff a forged document purporting to be an order, to restrict plaintiff's liberty without due process of law and deny her her rights to freedom of association and free exercise of religion, in violation of the First and Fourteenth Amendments to the *Constitution of the United States*.

229. **Count IV**. On or about May 29, 2002, defendant Indiana Court of Appeals summarily dismissed interlocutory appeal number 49A02-0204-CR-00278, taken from then-Marion Superior Court case number 49F10-0109-CM-177193, without a fair hearing of plaintiff's claims that the prosecution was brought to resolve matters of religious doctrine. Plaintiff had paid the requisite $250.00 docketing fee. Thus, plaintiff was deprived of her property interest in a fair hearing of her claims and of her right to petition the government for redress of grievances, in violation of the First and Fourteenth Amendments to the *Constitution of the United States*.

230. **Count V**. In February, 2004, defendants Beth-El Directors and Congregation Beth-El Zedeck collaborated with county government and IU officials to deny plaintiff her property interest in membership in Congregation Beth-El Zedeck and in participation in sisterhood activities, and her right to free exercise of religion, in violation of the First and Fourteenth Amendments to the *Constitution of the United States*.

231. **Count VI**. In February, 2004, defendant Beth-El Directors collaborated with county government and IU officials to deny plaintiff membership in Congregation Beth-El Zedeck and participation in its activities because plaintiff refused to comply with government-mandated religious practices, in violation of the First Amendment (Establishment Clause) to the *Constitution of the United States*.

232. **Count VII**. In March, 2004 defendants IHC and Adland conspired with government officials to intimidate plaintiff out of worshipping at Congregation Beth-El Zedeck by sending Adland to stalk her there and to communicate threats that plaintiff would be murdered for worshipping there, in violation of the First and Fourteenth Amendments to the *Constitution of the United States*. URJ and HUC-JIR have collaborated in these activities by retaining IHC as a member congregation and by retaining Adland as an ordained rabbi authorized to lead congregations.

233. **Count VIII**. During the period September, 2003 through December, 2003, when plaintiff's son was a minor child, agents of defendant Brebeuf have collaborated with Marion County government and IU officials to deprive plaintiff of her property interest in fair evaluations of her son's college applications, resulting in denial of her son's admission to Columbia University, the college of his choice, by communicating false defamatory information about plaintiff and her son.

234. **Count IX**. In a telephone call in late April, 2004, a Brebeuf administrator suggested that plaintiff would not be able to attend her son's graduation, presumably as a result of a retaliatory bogus "criminal complaint" communicated by Sarah Jackman to the Marion County Prosecutor's Office, in violation of the First and Fourteenth Amendments to the *Constitution of the United States*.

235. **Count X**. During the period December, 2003 up to the present defendant Sadler and members of the Marion County Clerk's Office have taken plaintiff's property interest in a fair hearing of her claims and deprived her of her right to petition the government for redress of grievances in Marion Superior Court civil cases by failing to communicate her filings to judges, by substituting forged, poor quality documents for plaintiff's real filings, by refusing to allow plaintiff access to the entire record of her cases, and by sending plaintiff forged "orders" purporting to be issued by judges, in violation of the First and Fourteenth Amendments to the *Constitution of the United States*.

236. **Count XI**: During the period August, 2003 through April, 2004 Judge Carroll has refused to relinquish jurisdiction over case number 49D06-0011-CP-001662, over which he lacked legal jurisdiction, in response to plaintiff's motions for same, thus allowing deprivation of plaintiff's property interest in a fair hearing of her claims without due process of law, and denying plaintiff her right to petition the government for redress of grievances, in violation of the First and Fourteenth Amendments to the *Constitution of the United States*.

237. **Count XII**. During the period January, 2004 up to the present, Judge McCarty has failed to respond to plaintiff's motions asking him to either hear her claims in case number 49D03-0004-CT-000580 or recuse himself and appoint a special judge, thus depriving plaintiff of her property interest in a fair hearing of her claims without due process of law, and depriving plaintiff of her right to petition the government for redress of grievances, in violation of the First and Fourteenth Amendments to the *Constitution of the United States*.

238. **Count XIII**: During the period November, 2002 up to the present, defendants Judges of the Indiana Court of Appeals, and Justices of the Indiana Supreme Court have taken plaintiff's property interest in a fair hearing of her claims in cases 49A02-0112-CV-883 and

49A02-0305-CV-00456 without due process of law and denied her the equal protection of the laws by issuing decisions based upon a record falsified by the Clerk of the Marion Superior Court and opposing parties, in violation of the Fourteenth Amendment to the *Constitution of the United States*. Plaintiff first affirmatively learned of the falsification of court records in documents provided to her by Marion County government officials in August, 2003 and October, 2003. Plaintiff informed the courts of the falsified record, to no avail.

239. **Count XIV**. During the period January, 2004 up to the present, defendant Judge Bradford has failed to respond to plaintiff's motions in cases over which he has jurisdiction, taking plaintiff's property interest in a fair hearing of her claims without due process of law, thus collaborating in efforts to take plaintiff's money without due process of law and her right to petition the government for redress of grievances, in violation of the First and Fourteenth Amendments to the *Constitution of the United States*.

240. **Count XV**. On or about July 21, 2003 as part of Marion Superior Court case number 49D01-0301-CT-000143, defendant Sadler's office sent plaintiff a purported court document stamped with a signature stamp but not signed by a judge, thereby falsely representing that the document did not require action, in order to induce plaintiff to incur a "debt," in violation of 15 U.S.C. § 1692e (15).

241. **Count XVI**. During the period September, 2003 through April, 2004, Wooden & McLaughlin attorneys have conspired with Sadler and IU employees in Marion Superior Court case number 49D01-0310-PL-001914 to take plaintiff's money without due process of law, in violation of the Fourteenth Amendment to the *Constitution of the United States*.

242. **Count XVII**. On or about February 4, 2004 defendant Wooden & McLaughlin attorneys obtained a document purporting to be a judgment against plaintiff, but which was not

authorized by a court, and falsely represented that plaintiff was in contempt of court and owed money to their clients, in violation of 15 U.S.C. §§ 1692e (7) and 1692e (9)

243. **Count XVIII.**On or about March 26, 2004 defendant Wooden & McLaughlin attorneys collaborated with Sadler's office to send to plaintiff a document purporting to be a court order ordering plaintiff to reveal her assets, to refrain from dissipating her assets and to appear at a hearing, but which was not authorized by a court, in violation of 15 U.S.C. §§ 1692e (9) and 1692e (13).

244. **Count XIX.** A provision of Ind.Code § 33-5.1-2-4 stating

"Sec. 4. The [Marion Superior] court has the following jurisdiction:
    (1) Concurrent and coextensive jurisdiction with the Marion circuit court in all cases and upon all subject matters...",

when interpreted literally violates the Supremacy Clause of Article VI and the First and Fourth Amendments to the *Constitution of the United States*, as applied to the states by the Fourteenth Amendment to the *Constitution of the United States*, and has been abused by defendant Indiana courts and judges and their associates to intrude in and disrupt every aspect of plaintiff's life.

245. **Count XX.** The provisions of the Indiana trespass statute under which plaintiff was charged, Ind.Code §§ 35-43-2-2 (a)(1) and 35-43-2-2 (a)(2), are overly broad and void for vagueness, inviting arbitrary enforcement, and thereby violating the Due Process Clause of the Fourteenth Amendment to the *Constitution of the United States*. The statutorily-prescribed punishment for the offense is excessive and cruel and unusual considering the nature of the crime, thus violating the Eighth Amendment to the *Constitution of the United States*.

246. **Count XXI.** During the period January, 1998 through April, 2004, defendant federal courts have issued and entered judgments against plaintiff in all of the federal cases at all levels listed in attached Exhibit 1, except one, based on filings inaccessible to plaintiff as a

member of the public, and not based on plaintiff's real filings. Plaintiff first affirmatively learned of the sequestration of part of the proceedings in March, 2004.

247.  **Count XXII.**  During the period May, 1997 through April, 2004, defendant federal courts (all) and judges refused to allow plaintiff to pursue her meritorious claims in the cases listed in Exhibit 1 by issuing judgments against her based on forged documents withheld from plaintiff, and on proceedings to which plaintiff was not invited, rather than on plaintiff's real filings and arguments, thus depriving plaintiff of her property interest in obtaining relief for her injuries without due process of law, and of her right to petition the government for redress of grievances, in violation of the First and Fifth Amendments to the *Constitution of the United States*. Plaintiff first affirmatively learned of the sequestration of part of the proceedings in March, 2004.

248.  **Count XXIII.**  During the period March, 2004 through April, 2004 judges of defendants District Court and Seventh Circuit have suggested vaguely in orders apparently based on portions of the record withheld from plaintiff, that plaintiff has committed crimes in her litigation of the cases in those courts, but have not specified what crimes she is alleged to have committed, how, and when, in violation of the Sixth Amendment to the *Constitution of the United States*. Plaintiff believes that the defendants in the cases are the real offenders and that she is being used as a scapegoat.

249.  As a result of defendants' actions, plaintiff has been denied her right to obtain relief for serious injuries, and has been denied her right to freely associate with those whom she chooses, which has caused significant financial harm and emotional distress.

## V. PRAYER FOR RELIEF

250.  Based on the foregoing, plaintiff requests that the Court order the following relief:

251. That Gerald Bepko's license to practice law be revoked, and that he be immediately and permanently barred from practicing law in all federal and Indiana courts.

252. That plaintiff be allowed to represent herself as she chooses in court proceedings without being forced to accept unwanted "representation" from unauthorized individuals.

253. That all defendant Indiana and Marion County courts and judges, and the Marion County Clerk produce for plaintiff's inspection and copying the entire record of each case to which plaintiff is or has been a party, including but not limited to all *in camera* material, all audiotapes (for voice identification), all transcripts of oral proceedings, all written documents filed or otherwise submitted to the courts.

254. That defendant Sadler and the Marion County Clerk's Office immediately take steps to ensure that plaintiff's court filings are expeditiously communicated to the judges authorized to hear the respective cases to which she is a party, and that defendant Sadler and the Marion County Clerk's Office immediately take steps to ensure that exact duplicates of all orders signed by said authorized judges are expeditiously transmitted to plaintiff.

255. That defendant Sadler and the Marion County Clerk's Office immediately refrain from communicating forged "orders" to plaintiff and forged "pleadings" to judges.

256. That defendant Sadler and the Marion County Clerk's Office immediately institute procedures to ensure that the trial court record submitted to the Indiana Court of Appeals is complete and accurate.

257. That defendants Marion Superior Court and Judges Pylitt and Hammel dismiss all four of the prosecutions against plaintiff, case numbers 49G21-9902-DF-025481, 49G21-0402-PO-427, 49G21-0104-CM-085681, and 49F07-0109-CM-177193, and expunge them from court records, as the prosecutions were brought to resolve religious disputes, to abuse plaintiff for re-

fusing to comply with government-established religious practices, and to punish plaintiff for crimes committed by other individuals, not by plaintiff.

258.  That defendants Marion Superior Court and Criminal Division judges to take steps to prevent the criminal justice system from being misused to impose government-sanctioned religious practices on plaintiff and to deprive her of her right to free exercise of religion.

259.  That defendant Marion Superior Court fire its entire probation department, hire individuals who will comply with the law, and affirmatively instruct probation officers that they are not authorized to take judicial actions.

260.  That the Indiana Court of Appeals re-open appeal number 49A02-0204-CR-00278 and hear it on the merits, taking steps to ensure that the record provided by the trial court is accurate.

261.  That defendant Indiana Supreme Court give plaintiff's original action petition a fair hearing on the merits.

262.  That defendants Indiana Supreme Court and Indiana Court of Appeals institute a procedure whereby criminal defendants can take appeal from convictions issued by unauthorized individuals and obtain a new trial, and that the trial court bear the costs of such appeals.

263.  That Beth-El Directors and Congregation Beth-El Zedeck admit plaintiff to membership in Congregation Beth-El Zedeck as had been promised.

264.  That the Court order URJ to dismiss IHC as a member congregation unless it immediately ceases its practice of misusing government services to violate plaintiff's civil rights.

265.  That IHC dismiss Jonathan Adland from his position, and that URJ and HUC-JIR immediately bar Jonathan Adland and Eric Bram from serving as congregational rabbis.

266.  That the Court order URJ and HUC-JIR to immediately cease their practice of inflicting psychologically impaired clergy on associated congregations and on the American public generally, to instruct candidates for clergy that they are obligated to comply with the secular laws of each state in which they reside and the United States, and to ensure that they ordain as clergy only those who exhibit an ability to conform their personal and professional behavior to such secular laws.

267.  That Brebeuf officials write a letter to the undergraduate admissions committee of Columbia University strongly supporting Ben's application there, and stating that Ben is very qualified for study at Columbia, and requesting that his application be re-evaluated.

268.  That Brebeuf, with the assistance of defendant Marion Superior Court, take steps to prevent Sarah Jackman from interfering in plaintiff's or her son's affairs as related to Brebeuf activities, and advise her to physically stay away from plaintiff and her son Ben.

269.  Preferably, that Brebeuf fire Sarah Jackman. Plaintiff has made a number of voluntary donations of money and other property to Brebeuf. Thus, plaintiff has an interest in ensuring that her donations are used in accordance with the law and with plaintiff's values, and to promote the well-being of the Brebeuf community. Plaintiff has found Sarah Jackman's actions to be contrary to these goals.

270.  That defendant Marion Superior Court take steps to keep Sarah Jackman physically away from plaintiff's neighborhood, the College Park subdivision in Marion County, Indiana.

271.  That Judge McCarty rule on plaintiff's motions in the case *Srivastava v. Indianapolis Hebrew Congregation, Inc.*, et al., number 49D03-0004-CT-000580, and allow the case to proceed to trial on the merits.

272.   That defendants Judge Carroll and Indiana Court of Appeals relinquish jurisdiction over the case *Srivastava v. Indianapolis Hebrew Congregation, Inc., et al.*, number 49D06--0011-CP-001662, dismiss the counterclaims, and vacate all judgments and orders issued in the case.

273.   That Judge Bradford rule on plaintiff's motions in the case *Srivastava v. Harring-ton, et. al.*, number 49D01-0310-PL-001914, and vacate all unauthorized "judgements" and "orders."

274.   Declaratory relief that Ind.Code § 33-5.1-2-4 as stated violates the *Constitution of the United States*.

275.   That the Court defendants Indiana court judges from enforcing Ind.Code § 33-5.1-2-4 to the extent that doing so would violate plaintiff's rights under the *Constitution of the United States*.

276.   Declaratory relief that Ind.Code §§ 35-43-2-2 (a)(1) and 35-43-2-2 (a)(2) violate the Due Process Clause of the Fourteenth Amendment to the *Constitution of the United States*, and an order to modify the statute to prevent its arbitrary enforcement, and to mandate punishment appropriate for the nature of the offense.

277.   That all defendant federal courts and judges produce for plaintiff's inspection and copying the entire record of each federal case listed in attached Exhibit 1, including but not limited to all *in camera* material, all audiotapes (for voice identification), all transcripts of oral proceedings, all written documents filed or otherwise submitted to the courts.

278.   That federal district judges be ordered to re-open the cases in which plaintiff was plaintiff, that is, to grant plaintiff's motions submitted pursuant to *Fed.R.Civ.P.* 60 (b)(4), and to

accord plaintiff a fair, due process hearing of her claims in each of the cases which she chooses to re-open.

279. That the Court order Marion Superior Court to review every conviction and every award of monetary damages against a civil plaintiff from January 1, 1995 (the day Newman became prosecutor and Cottey became sheriff) up to the present, to vacate all convictions illegally obtained, to allow civil plaintiffs who have been intimidated into dismissing valid claims to re-open their cases, and to correct all inaccuracies in court records.

280. That Indiana and federal courts effect criminal prosecutions of syndicate members, so that they will stop using government positions to commit crimes against plaintiff.

281. That defendant United States Supreme Court issue an opinion in an appropriate case, such as *Srivastava v. Cottey, et al.*, affirmatively holding that judges, prosecutors, sheriffs and clerks may not use their positions to abuse private citizens, and affirming citizens' right to obtain relief for government abuses through civil litigation, as allowed by 42 U.S.C. § 1983 (and racketeering statutes); and also affirming that *pro se* litigants should be given equal access to the courts and should not be compelled to accept "representation" by unscrupulous individuals.

282. That Sadler and Wooden & McLaughlin reimburse plaintiff for expenses incurred in responding to their unlawful use of the courts to extort money from plaintiff, pay plaintiff $1,000.00 in additional damages as allowed by 15 U.S.C. § 1692k (a), and stop their practice of misusing the courts to take plaintiff's money without due process of law.

283. That the costs of this litigation be awarded to plaintiff.

## VI. AFFIRMATION OF PLAINTIFF

I, the plaintiff in the aforementioned cause, do affirm that I have read all of the statements contained in the complaint and that I believe them to be, to the best of my personal knowledge, true and correct.

Signed this ____ day of May, 2004.

Carolyn H. Srivastava, Plaintiff *pro se*
3105 Lehigh Court
Indianapolis, IN 46268
(317) 876-0421